Lawrence JOHNSON, et al., Plaintiff,

v.

NORTHWEST AIRLINES, Defendant.

No. 89–72590–DT.

United States District Court, E.D. Michigan, S.D.

Dec. 20, 1993.

**1254**

Stephen R. Tomkowiak, Detroit, MI, for plaintiff.

Joseph C. Marshall, III, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court, after trial to the bench. Plaintiff, Lawrence Johnson, an African American man, has filed this lawsuit against his former employer, Northwest Airlines, alleging intentional racial discrimination, in violation of Title VII of the Civil rights Act of 1964, 42 U.S.C. Section 2000e *et seq.* ("Title VII").

In August of 1986, when Defendant Northwest Airlines merged with Republic Airlines, Plaintiff, who had been a Republic Airlines Flight Attendant, became an employee of Defendant, and remained so employed until February 1989, when he was discharged after suspension on December 23, 1988, for misappropriation of company funds. For the reasons outlined below, this Court finds that Plaintiff's complaint must be dismissed and judgment entered for Defendant Northwest.

Plaintiff, a 47 year old resident of Memphis, Tennessee, earned a Bachelor of Arts degree in Sociology from Lane College in 1968 and a Masters degree in Social Work from Atlanta University in 1976, after which he started his career as a Flight Attendant with Southern Airlines. When Southern Airlines merged with North Central to form Republic Airlines, Plaintiff continued with that company and he transferred to the employ of Defendant following the acquisition of Republic by Northwest.

In November of 1986, the procedures which had been utilized for in-flight liquor sales by Republic Airlines were discontinued and Defendant Northwest Airlines replaced them with its own, to achieve uniformity in accounting for such sales throughout the company. By September of 1987, Northwest had also computerized its accounting for all in-flight sales and distributions of liquor, in order to more accurately ascertain liquor costs and revenues than had been possible with manual record-keeping.

The cost accountant who was Manager of Catering and In–Flight Sales at the time, Rick Swan, described the manner in which the computerized accounting system was ultimately developed. As Plaintiff and all other Flight Attendants were undisputedly trained and uniformly required to implement it, the system provided a number of checks and balances enabling the tracing and verification of responsibility for liquor purchased by the company for in-flight sales. Once the sales receipts had been computerized, a programmer was assigned to develop a system matching sales as reported on receipts submitted by Flight Attendants to the supplier against the deposits which Flight Attendants were required to make of the sales proceeds. The lead Flight Attendant on each flight was required to open a sealed caterer's liquor box for the flight, sign a multi-copy serial-numbered receipt (FS60 Form) for the liquor inventory found in the box and all removed therefrom, and reseal the box at flight termination with one receipt copy inside, which the supplying caterer would later submit as a voucher for payment. Promptly at termi-

nation of each flight the attendant was required to deposit all proceeds of liquor sold, with a second copy of the FS60, at the airline cashier's office in the destination airport. The cashier was to count all proceeds in the presence of the attendant, and both parties executed a log of the transaction. Finally, the Collective Bargaining Agreement required that each lead Flight Attendant retain a copy of every FS60 signed for at least six months, to be produced in resolution of any charges made concerning responsibility for the funds.

The rule on prompt deposits was strictly enforced, as is evidenced by the several letters of reprimand and two brief suspensions which Plaintiff Johnson suffered, for making his deposits tardily. There is absolutely no dispute concerning Plaintiff's full understanding of this system and the consequences of noncompliance. Both he and his Base Manager, Pat Rummage, testified to the rigidity with which this system was enforced, and to his prior laxity in compliance.

Pursuant to this system Mr. Swan, at the Northwest In–Flight Sales Department in Minneapolis, would ideally have received perfectly correlated vouchers from caterers claiming payment for liquor sold and from the Flight Attendants' and cashiers' accountings for that same liquor. However, Mr. Swan testified that, to the contrary, a serious problem became apparent. A very substantial sum was reported in liquor sales which had not been deposited by the over 2,000 Flight Attendants who appeared to have made those sales.

Accordingly, in June of 1988, Mr. Swan obtained a computer printout ranking all Flight Attendants who apparently had failed to deposit company funds, in order of the amount of missing money chargeable to each of them, from largest to least. Mr. Swan took his printout, for discussion purposes, to a meeting which he had requested for guidance as to how the apparent problem should be resolved. The meeting included personnel from his In–Flight Sales Department, the Flight Services Department, Labor Relations, and the Auditing Department. The company's General Auditor, John O. Klinkenberg, directed project auditor Douglas Yako-

la, a specialist in fraud investigation, to assist Randall Ohm, Northwest's Labor Counsel, in conducting an investigation of the missing In–Flight sales deposits.

Messrs. Ohm, Swan, and Yakola all testified, with complete credibility, as to the manner in which they conducted the ensuing investigation, which led to the discharge of 37 Flight Attendants including Plaintiff Johnson, before it was discontinued in 1989. Although that investigation might, in hindsight, have proceeded differently and more efficiently, there is absolutely nothing in the evidence of record surrounding it to lend even a scintilla of support to Plaintiff's claim that he was, in this discharge, treated differently and less favorably than similarly situated white Flight Attendants because of his race. His claim that the procedures followed were not motivated by legitimate business reasons and that the reasons proffered were pretexts for race discrimination is equally without support in the record. In fact, none of the investigators or decisionmakers knew the race of any Flight Attendant on the computer lists utilized to select attendants for hearings until that attendant appeared in the office of Labor Counsel for his or her hearing.

Mr. Yakola started with Flight Attendant Jane Burt, who was listed at the top of the first computerized printout as responsible for the largest sum of missing funds of all of the 2,000 persons identified. She was based in Minneapolis, and white. Mr. Swan's office pulled hard copies of all of her records, and she was then summoned to Mr. Ohm's Labor Counsel office (with her Base Manager and Union Representative, as the union contract required) where she confessed to keeping the missing liquor sales proceeds, and was terminated for theft. Thereafter, the investigators proceeded down the first list and made several terminations for theft, but also discovered that the list contained several computer errors and blind leads.

It must be noted that the Flight Attendants were not called to their hearings at Labor Counsel's Minnesota office in the exact order in which their names appeared on this list, or on the two subsequently generated computer lists which also were utilized to

identify suspects. As Mr. Ohm explained, when the attendants were called to their hearings they were given the opportunity to produce any evidence they might, such as the FS60 copies which they were required by Collective Bargaining Agreement to retain for six months, and which would certainly be helpful in protecting them from responsibility for funds either improperly credited or wrongfully taken by cashiers or caterers. They also were given the contractual right to be accompanied by their Base Managers and Union Representatives. Mr. Ohm testified that because of this requirement of the presence of each Base Manager and Union Representative, he attempted to schedule three Flight Attendants *from the same base* for each day of hearings held. The union requested scheduling of hearings by Base, to reduce the requisite travel; and the Base managers were equally concerned to minimize days absent from their posts. Moreover, the flight schedules of the Flight Attendants themselves required departure from the order of the lists, in setting hearings. Messrs. Yakola and Ohm further testified that, when Ohm requested that Mr. Yakola send three from a given base for hearing on a given day, Mr Yakola was not even always able to send the next three on the list *from that base*, because Yakola was required to assemble hard copies of all computerized records of the next three from that base, and was also required to call Mr. Swan of catering, in turn, to ask that Swan assemble his Department's original records on the flights in question and forward them to Audit. Swan's material did not always reach Yakola in the order requested, nor did Yakola's always reach Ohm in that order. Swan testified, in fact, that when the next name from the requested base involved a great many transactions, he sometimes moved to the next name below it from that base and prepared a less voluminous case, so that Ohm would have the requisite three cases in time for the next day of hearings. Despite all of these aberrations from strict rank order in pursuit of the potential wrongdoers, however, there is still no evidence whatsoever that race played any part in the decision to schedule the hearing of any Flight Attendant. None of the above-identified investigators ever knew the race of an attendant until the hearing; and by the time an attendant appeared for hearing, the die was cast. If no accounting was made for the missing funds, he or she was terminated.

On the first list, the basis for commencement of the investigation in August of 1988, Plaintiff's name was ranked 273rd in amount of missing funds. Undisputedly, his name would never have been reached and he would never have been discharged, despite all other aberrations from rank order, if the investigators had continued to pursue this list.

However, because of the numerous errors which surfaced from the first list, and which disclosed no wrongdoing whatsoever by some persons ranked high in missing funds, it was decided to generate a *second* printout, ranking the Flight Attendants by frequency of failure to make a deposit of funds. In October of 1988, the second printout was completed, and the investigative team decided to schedule future hearings from this list, on which Plaintiff ranked 25th. It was from this list that Plaintiff was discharged, ultimately. These rankings, like the first, were made totally on the basis of the relevant numbers, and in total ignorance of the race of anyone listed.

Messrs. Ohm and Yakola travelled to Detroit to hold the first group of hearings from the second list, for Detroit-based Flight Attendants. They were discharged. Then Yakola skipped one Memphis-based attendant (Mayes, a Black) to prepare a group of three Seattle-based attendants, all of whom were also discharged. Next, three from Minneapolis, after which he returned to the previously skipped Memphis-based Mayes, and skipped seven Detroit names to create a Memphis group of three. After forwarding that group to Ohm, Yakola received a call from Ohm requesting addition of a fourth name to the Memphis group because of the likelihood that one would fail to appear. Unfortunately for Mr. Johnson, Yakola added him, the next Memphis name on the list, to the hearing schedule.

On December 23, 1988, as scheduled, Mr. Johnson appeared with his attorney, Union Representative, and Base Manager, acknowl-

edged his signature on all FS60 receipts produced by the investigators, and was unable to explain or demonstrate having made the missing deposits. He was given additional time to search his records, although immediately suspended; and on February 23, 1989, he was discharged for theft of $268.00. The just cause of his discharge is still pending in arbitration, under the Collective Bargaining Agreement.

After Plaintiff's hearing, Yakola began preparation of the Detroit cases which he had skipped for the Memphis group. Labor Relations had requested three cases for each of three days of hearings to be held in January, 1989. Yakola testified that, after completing approximately seven of the nine necessary cases, he received two extremely large files containing numerous transactions by Detroit attendants Nicholson and Morris. Because each of those would have required six or seven days of work to prepare, he instead chose two thinner files from Detroit attendants lower on the list, who had made no deposits whatsoever.

Then, on January 6, 1989, a third computer ranking was run, updating the previous data through November of 1988. Nicholson and Morris of Detroit still had not been set for hearing when Yakola received the new printout. He testified that, after studying the data, he took their files to Labor Relations and pointed out the fact that they showed very few, if any, missing deposits within the six month period for which a Flight attendant is required to retain FS60 Forms, and presented potential challenges, if discharges were made.

Accordingly, Nicholson and Morris were set aside, and the investigators thereafter utilized the third and newest printout, in pursuit of more recent wrongdoings. Yakola testified that he had always intended to return eventually to every name skipped until the entire program was called to a halt.

He never knew the race of any Flight Attendant, until he attended their hearing, and never considered or was given any suggestion of considering race or directed to choose a specific individual in any selection decision he made. Nicholson and Morris have turned out to be white, however, and Plaintiff points to them as having been treated more favorably than he. Both were ranked higher in missing deposits than Plaintiff, and neither was ever called to Minneapolis for hearing or discharged.

Nicholson and Morris, as well as the entire 2,000 suspects of the computer listing, eventually would have been called to a hearing in Minneapolis, but for the fact that the entire investigative program was halted altogether, in early 1989.

Mr. Ohm testified to the events which terminated the investigation. The first of the discharges had made their way to Arbitration for just cause, under the Collective Bargaining Agreement, by January of 1989, and Labor Counsel had noted that the success of those cases had been based in large part upon the failure of the discharged attendants to produce the FS60 forms they were required to keep for a six month period, to negate the charge that they had failed to make deposits. It appeared to Mr. Ohm, with the data of the third computer printout and the passage of time, that it would be wisest to prosecute attendants only within the six month period they were required to retain those records. That would make an arbitration victory much more of a certainty. Then, as the investigators changed their focus to the latest list, the union's demands for prompt arbitrations absorbed even greater staff time in the Labor Counsel's office, making it impossible to move quickly on new investigations. The union then served a subpoena demanding massive documentation from Labor Counsel forthwith and, finally, a lawsuit was filed challenging the entire program. Ohm testified that he suspended the activity altogether at that time, at the direction of Northwest's General Counsel.

At the end of the day, 37 Flight Attendants had been terminated of the over 2,000 listed as suspects. Of those terminated, twenty were white, sixteen were African–American, and one was Asian American. Plaintiff identifies the two white persons skipped, Nicholson and Morris, as having been treated more favorably than he, and as proof that he was the victim of intentional racial discrimination. The evidence is over-

whelming and indeed undisputed, however, that none of the investigators knew either their race or Plaintiff's, when selecting attendants for hearings. The races of the thousands of suspected attendants remaining on the third list, who benefitted with Nicholson and Morris from the cessation of the program, remain unknown to this day. The record is also barren of evidence as to the total number of Flight Attendants employed by Northwest during the relevant period or the racial makeup of that universe.

Pursuant to 28 U.S.C. Section 1331, this Court has federal question jurisdiction over the instant lawsuit which is limited to a claim brought under Title VII.

Section 703(a)(1) of Title VII provides in its pertinent part:

"It shall be an unlawful practice for an employer—

"(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. Section 2000e–2(a)

In a case charging intentional discrimination on the basis of his race, Plaintiff first bears the burden of establishing, by a preponderance of the evidence, a *prima facie* case of a racially discriminatory discharge pursuant to Section 703(a)(1) of Title VII. *McDonnell Douglass Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Leonard v. City of Frankfort Electric and Water Plant Bd.,* 752 F.2d 189, 193 (6th Cir.1985). The criteria for such a *prima facie* case, as defined in *McDonnell Douglass, supra,* 411 U.S. at 802, 93 S.Ct. at 1824, include a showing by Plaintiff that: (1) he is a member of a protected class; (2) he was discharged; (3) he was treated differently than similarly situated white people; and, (4) his employer' solicited applicants for the position from which he was discharged. *Potter v. Goodwill Industries,* 518 F.2d 864, 865 (6th Cir.1975); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). When a *prima facie* case is established by Plaintiff, the burden of production, but not of proof, then shifts to

the Defendant, who is required to "articulate a legitimate, non-discriminatory reason" for the allegedly discriminatory treatment. *Id.* at 254–55, 101 S.Ct. at 1094–95. In short, through the introduction of admissible evidence, the defendant must show legitimate reasons for its action which, if credited by the trier of fact, would support a finding that there was no unlawful discrimination causing the discharge. *Id.* at 254–55, 101 S.Ct. at 1094–95.

If such a showing is made, Plaintiff then is required to show that the reasons articulated by the defendant are a pretext for discrimination, and that the discrimination claimed was the real reason for the termination. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2751–2752, 125 L.Ed.2d 407, 421–422 (1993); *see also Burdine, supra,* 450 U.S. at 253, 254–56, 101 S.Ct. at 1093, 1094–95. The district court must "decide the ultimate factual question of whether Defendant intentionally discriminated against the Plaintiff." *St. Mary's Honor Center, supra,* —— U.S. at ——, 113 S.Ct. at 2753, 125 L.Ed.2d at 424, *quoting U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). In so deciding, it is not enough to disbelieve the reasons proffered by the employer, but the factfinder must be convinced, by a preponderance, of Plaintiff's explanation of intentional discrimination. *Id.* —— U.S. at ——, 113 S.Ct. at 2754, 125 L.Ed.2d at 424. Thus, although *McDonnell Douglas* and its progeny shift the burden of production to the Defendant, "[t]he ultimate burden of persuading the trier of fact that the Defendant intentionally discriminated against the Plaintiff remains at all times with the Plaintiff." *Id.* at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416; *Galbraith v. Northern Telecom,* 944 F.2d 275, 279 (6th Cir.1991); *Rowe v. Cleveland Pneumatic Co., Numerical Control Inc.,* 690 F.2d 88, 92–93 (6th Cir.1982). Plaintiff must prove, in short, "that whatever the stated reasons for his rejection, the decision was in reality racially premised." *St. Mary's Honor Center, supra,* —— U.S. at ——, 113 S.Ct. at 2753, 125 L.Ed.2d at 423 (1993), *quoting McDonnell Douglas Corporation v. Green,* 411 U.S. 792,

805–806, 93 S.Ct. 1817, 1825–1826, 36 L.Ed.2d 668 (1973). However, where a decision is putatively race based, it naturally follows that a Defendant accused of intentional racial discrimination would have to know the race of the Plaintiff as well as that of other similarly situated employee[s].

In *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir.1987) *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989), the Ninth Circuit wrote that it would not be rational to infer intentional racial discrimination when the decisionmakers had no knowledge of the race of the Plaintiff. That Court, in affirming the grant of a Summary Judgment for Defendant, wrote as follows:

Under Title VII or under Section 1981, a Plaintiff must prove intentional discrimination to make out a discrimination claim using a disparate treatment theory. *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 537 (9th Cir.1982) (Gay). *An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race.* Robinson contends, however, that he may discharge his prima facie burden of production by offering proof of the four elements articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and that *McDonnell Douglas* merely requires proof that he belongs to a racial minority. See id. at 802, 93 S.Ct. at 1824; *Gay*, 694 F.2d at 538 & n. 5.

The *McDonnell Douglas* test, however, "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence ... on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The *McDonnell Douglas* test defines one method of proving a prima facie case of discrimination—proof from which a trier of fact can reasonably infer intentional discrimination. See *Gay*, 694 F.2d at 538. But the *McDonnell Douglas* elements *would not rationally create this inference if, as here, a plaintiff offers proof that he is Black, but there is no showing by direct or indirect* *evidence that the decision-maker knew this fact.* (Emphasis supplied). *Robinson, supra* at 1316.

The settled law requires, accordingly, on the facts of record in this case, that Judgment be entered for Defendant Northwest. There is not only absolutely no evidence to suggest that any of the decisionmakers who conducted this investigation knew the race of any of the Flight Attendants on any of the three computer lists utilized when they selected personnel for hearings, but there is also ample proof that they did not, in their uniformly credible testimony. Moreover, their testimony that race played absolutely no role in any of their decisions was unimpeached and unrebutted by any other evidence in the case.

Moreover, even if it is assumed, arguendo, that Plaintiff has made a prima facie case of intentional discrimination, which he did not, the court must nevertheless find he has failed to rebut the legitimate nondiscriminatory reasons given for the actions taken by Northwest, by a preponderance of the evidence. There is no evidence at all which suggests that any explanations given for the unfortunate events surrounding Plaintiff's discharge were a pretext for invidious racial discrimination.

Accordingly, for all of the reasons discussed above, Plaintiff's complaint MUST BE AND HEREBY IS, DISMISSED, and Judgment is entered for Defendant Northwest Airlines.

IT IS SO ORDERED.