53 F.3d 331
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Lawrence S. JOHNSON, Plaintiff-Appellant,
v.
NORTHWEST AIRLINES, Defendant-Appellee.
 No. 94-1076.
 United States Court of Appeals, Sixth Circuit.
 April 24, 1995.
 
 Before: BROWN, NORRIS, and SURHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 The plaintiff, Lawrence Johnson, appeals the judgment in favor of the defendant, Northwest Airlines, in this Title VII race discrimination claim. The district court granted Northwest's summary judgment motion with regard to Johnson's disparate impact claim, and, after a bench trial, it also dismissed Johnson's disparate treatment claim. We AFFIRM.
 
 I.
 
 2
 Lawrence Johnson, a middle-aged black man, was allegedly fired from his job as a flight attendant for Northwest Airlines because he stole the proceeds from liquor he sold to Northwest passengers. He was one of thirty-seven flight attendants fired, twenty white, sixteen black, and one asian, after a tedious and cumbersome investigation involving the compilation and organization of various employment-related documents, as well as a termination hearing. Northwest began investigating, however, by organizing documentation, a total of forty-three flight attendants. The investigation did not reach the hearing stage with regard to six of them--all white.[1] These white flight attendants, who were not subject to a hearing, were not fired.
 
 
 3
 The plaintiff does not argue that he is innocent of stealing liquor proceeds. Rather, he argues that the investigation which uncovered him was racially discriminatory, making it necessary to describe the investigatory process in greater detail.
 
 
 4
 In the summer of 1988, when it became apparent to Northwest that there was widespread theft of its liquor proceeds, Rick Swan, the head of the Sales department, generated a computer printout listing over 2,000 flight attendants with missing deposits. The flight attendants were ranked in order from the greatest amount of missing funds to the least. The plaintiff, Johnson, ranked 273rd on this list.
 
 
 5
 Swan gathered documentation on the first person on the list, a white woman, which tended to confirm that she had a number of missing deposits. Labor counsel for Northwest, Randall Ohm, then held a hearing in Minneapolis, where the woman was represented by counsel and a union representative. When she could not account for the missing deposits, either by showing the cashier-deposit receipts she was required to keep for six months, or through other exculpatory documentation, she was fired.
 
 
 6
 As Swan proceeded down the list, it became apparent that it was not a very accurate indicator of theft. Swan and Ohm thus created a new list, ranking the flight attendants by the frequency of missing deposits, as opposed to the total dollar amount. Johnson ranked twenty-fifth on this new list.[2]
 
 
 7
 Though the flight attendants were ranked according to the frequency of their missing deposits, Ohm did not call suspects to the Minneapolis hearing in strict numerical order. Rather, flight attendants, at the union's request, were grouped for hearings according to their respective airport bases. J.A. at 2799-80. Thus, attendants based in Detroit were grouped together, attendants based in Memphis were grouped together, etcetera. It was this base grouping which resulted in Johnson being called to a hearing in Minneapolis. As the district court stated:
 
 
 8
 Messrs. Ohm and Yakola travelled to Detroit to hold the first group of hearings from the second list, for Detroit-based Flight Attendants. They were discharged. Then Yakola skipped one Memphis-based attendant (Mayes, a Black) to prepare a group of three Seattle-based attendants, all of whom were also discharged. Next, three from Minneapolis, after which he returned to the previously skipped Memphis-based Mayes, and skipped seven Detroit names to create a Memphis group of three. After forwarding that group to Ohm, Yakola received a call from Ohm requesting addition of a fourth name because of the likelihood that one would fail to appear. Unfortunately for Mr. Johnson, Yakola added him, the next Memphis name on the list, to the hearing schedule.
 
 
 9
 Johnson, 839 F.Supp. at 1256. At the hearing, Johnson could not rebut the charges of theft. Northwest fired him.
 
 
 10
 Sometime after Johnson was fired, the first challenge to a discharge based on this investigation proceeded to arbitration. Northwest's labor department therefore shifted its focus from investigating flight attendants to defending its decision to fire flight attendants pursuant to its investigation. It became clear after several arbitrations that a discharge for theft would only be upheld if the flight attendant could not produce the deposit receipts he was required to keep for six months. Thus, in order to shield its decision to discharge a flight attendant from arbitral challenge, Northwest instituted a "six month rule"--if a flight attendant had only a few missing deposits within the six months preceding the investigation, Northwest would skip that person due to the likelihood that his discharge would be overturned in arbitration.
 
 
 11
 Shortly thereafter, Northwest terminated the investigation altogether because a lawsuit was filed against it challenging the investigation's validity.
 
 
 12
 Thus, as a result of a conglomeration of factors--the changed computer printout list,[3] the grouping of flight attendants in accordance with their airport base, the six month rule, and the premature end of the investigation--documentation was organized for six white flight attendants, but they were never called to a hearing. The plaintiff contends that this is evidence of both disparate treatment and disparate impact.
 
 
 13
 The district court found that Swan, Yakola, and Ohm testified with complete credibility, and that none of them knew the race of any person they were investigating until the final step of the investigation--the hearing. And, as the district court noted, "by the time an attendant appeared for a hearing, the die was cast. If no accounting was made for the missing funds, he or she was terminated." Johnson, 839 F.Supp. at 1256. Although the plaintiff did not challenge his discharge in arbitration, he did bring this lawsuit under Title VII. As stated before, the district court granted summary judgment for the airline on the disparate impact claim, noting that "there [was] no suggestion of how the impact took place," J.A. at 1389, and it dismissed the plaintiff's disparate treatment claim after a bench trial. With respect to the disparate treatment claim, the district court reasoned that because the individuals conducting the investigation did not know the race of the flight attendants until the hearing, they could not have discriminated on the basis of race. Johnson, 839 F.Supp. at 1259. The plaintiff brought this appeal.
 
 II.
 
 14
 On appeal, the plaintiff contends that the district court clearly erred in finding that the investigators did not know his race until the time of the hearing. We review the district court's findings of fact in this regard under a clearly erroneous standard. Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985); Sanders v. Dorris, 873 F.2d 938, 942 (6th Cir.1989).
 
 
 15
 Intentional discrimination is required to establish a disparate treatment claim under Title VII. Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 645 (1989). An employer cannot intentionally discriminate against an individual on the basis of race if he is unaware of that individual's race. Robinson v. Adams, 847 F.2d 1315, 1316 (9th Cir.1987). Thus, the plaintiff's disparate treatment claim fails so long as the district court did not err in making one key finding: that the investigators had no knowledge of the plaintiff's race until the hearing.
 
 
 16
 The plaintiff challenges this finding by stating that Randall Ohm, the person who conducted the hearing, talked to the base manager prior to selecting an attendant for a hearing, and that the base manager definitely knew the plaintiff's race. Thus, reasons the plaintiff, the investigators could have discovered the plaintiff's race by talking to the base manager.[4]
 
 
 17
 Just because Ohm could have discovered the plaintiff's race, however, does not mean he did. The plaintiff presented no evidence that the base manager told Ohm the plaintiff's race, and Ohm testified, with what the district court referred to as complete credibility, that he did not know Johnson's race until they met at the hearing. This finding is not clearly erroneous, and the district court correctly dismissed the plaintiff's disparate treatment claim.
 
 III.
 
 18
 For the first time on appeal, the plaintiff attempts to fully articulate a disparate impact claim. He states that forty-five persons had their documentation pulled and organized by Swan and Yakola; thirty-seven were called to a hearing and subsequently fired; the eight persons who escaped the hearing and were not fired were all white.[5] Thus, using various statistical analyses, the plaintiff attempts to show that the airline's racially neutral investigatory procedure had a disparate impact on blacks in general and him in particular.
 
 
 19
 There is some question over whether this claim was properly raised in the court below, but regardless, we find it wanting. A disparate impact claim requires a baseline statistic and a derivative statistic, and a proportional imbalance between the two. See Wards Cove, 490 U.S. at 650-51. The idea is that some neutral employment practice of the employer creates a proportional disparity between the baseline (a qualified labor pool of 10% blacks, for example), and the derivative (a workforce of 1% blacks), making the employment practice discriminatory. In other words, the employment practice has a disparate impact on a legally protected group. In this case, the plaintiff gives us no reason why his baseline, the number of flight attendants who had their documentation pulled, provides the appropriate statistic, as opposed to the number of flight attendants on the computer printouts, or the number of attendants called to a hearing. Absent such a reason, the plaintiff's claim fails.
 
 IV.
 
 20
 Accordingly, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 The plaintiff contends that eight, not six, white flight attendants were the subject of preliminary investigations and then not fired. The district court does not address this issue, noting only that two white flight attendants were subject to preliminary investigations, and then not fired. Johnson v. Northwest Airlines, 839 F.Supp. 1253, 1257 (E.D.Mich.1993)
 
 
 [2]
 At some point, Douglas Yakola from the auditing department was added to the investigation team. He created spreadsheets organizing the documentation gathered by Swan, and passed that information onto Ohm
 
 
 [3]
 A third computer list was generated updating the second list. Sometime after Johnson was fired, the company began relying on the third list. However, the information and organization of the second and third lists were basically the same
 
 
 [4]
 The plaintiff cites two cases in support of this argument. However, both cases make clear that an employer's knowledge of an employee's race is a finding of fact, subject to clearly erroneous review. EEOC v. Lilja Construction Corp., 62 Fair Empl.Prac.Cas. (BNA) 1192, 1195 (N.D.Cal.1993) (making an explicit finding of fact that the employer knew the employee's race); Jacobson v. Pitman-Moore, Inc., 582 F.Supp. 169 (D.Minn.1984) (noting that a jury could have inferred a defendant's knowledge from the facts surrounding the discharge)
 
 
 [5]
 As stated before, there is some question regarding the exact number of whites who were subject to a preliminary investigation and not called to a hearing