**Elle CARMICHAEL, as Administratrix of the Estate of Romona Moore, Plaintiff,**

v.

**The CITY OF NEW YORK, Robin D. Wallace, Adrianne R. Wallace, Kayson Pearson, and Troy Hendrix, Defendants.**

**No. 06–cv–1913 (NG)(VVP).**

United States District Court, E.D. New York.

Signed Aug. 1, 2014.

Robert J. Barsch, Levittown, NY, David Evan Gottlieb, Douglas Holden Wigdor, Tanvir Haque Rahman, Wigdor LLP, New York, NY, for Plaintiff.

Arthur G. Larkin, NYC Office of Corporation Counsel, Gabriel Paul Harvis, Harvis Wright & Fett LLP, Robyn Nicole Pullio, Shawn Fabian, Susan P. Scharfstein, The New York City Law Department, New York, NY, A. Lorenzo Bryan, Law Office of A. Lorenzo Bryan, LLC, Brooklyn, NY, for Defendants.

Robin D. Wallace, Brooklyn, NY, pro se.

Adrianne R. Wallace, Brooklyn, NY, pro se.

### OPINION & ORDER

GERSHON, District Judge:

Plaintiff Elle Carmichael, as administratrix of the estate of her daughter, Romona Moore, identified in the complaint as African-American, brings this action pursuant to 42 U.S.C. §§ 1983 and 1981. She alleges that defendant City of New York, as part of a discriminatory city-wide practice, deprived Ms. Moore of her constitutional rights by failing to label her "missing" when her disappearance was first reported to the police, and then failing to conduct an immediate investigation, as it would have done for a white person reported missing. The City now moves for summary judgment on both claims. For the reasons explained below, the City's motion for summary judgment is granted.[1]

### BACKGROUND

Except where noted below, the historical facts are undisputed.

### I. Romona Moore

Ms. Moore, born on October 8, 1981, lived with her mother, Ms. Carmichael, on Remsen Avenue in Brooklyn. On April 24, 2003, at approximately 7:00 p.m., Ms. Moore left home, telling her mother that she was going to the Burger King located half a block away. Ms. Moore did not return.

Around 9:00 a.m. the next morning, Ms. Carmichael called the NYPD's 67th Precinct to report her daughter missing. She was told to call 911 instead. Ms. Carmi-

chael called 911, expressing concern that something was wrong because her 21-year-old daughter never returned from a trip to Burger King.

Officer Monique Richardson and another officer visited Ms. Carmichael's home in response to her 911 call. Ms. Carmichael repeated what she told the operator, further explaining that Ms. Moore was a "delicate child," had registered for summer classes at Hunter College only the day before, was a successful student who never missed a lecture, and that it was uncharacteristic for her to go out and not call or return home. Ms. Carmichael informed Officer Richardson that she had since called her daughter's friend, "Gary" (Williams) and that he said that Ms. Moore had been at his house the evening before. The police later learned that Ms. Moore was at Mr. Williams's house, in the same neighborhood, very briefly, and then said she was going to Burger King and would call him when she got home.

Officer Richardson stated that she would file a report at the precinct for informational purposes, but that she could not file a "missing persons" report because Ms. Moore was not sixteen years old or younger. Officer Richardson said that, if Ms. Carmichael were still concerned, she could call the precinct that night at 7:00 p.m., since it takes twenty-four hours for any action to be taken for missing persons. Officer Richardson's informational report indicated Ms. Moore's race. Around 9:30 a.m. on April 25, 2003, the NYPD closed Ms. Moore's case.

As directed, Ms. Carmichael called the 67th Precinct at 7:00 p.m. that night, explaining to Detective Patrick Henn that

---

1. Plaintiff has withdrawn her claims against defendants Kayson Pearson and Troy Hendrix, who are serving life sentences for the murder of Ms. Moore; and Robin and Adrianne Wallace, alleged to own the premises where the murder took place, are in settlement discussions with plaintiff.

two police officers who visited her house that day told her to call at 7:00 p.m., and she asked him whether there would be an investigation. In a "nasty manner," Detective Henn stated that Ms. Carmichael's daughter was 21 years old; Officer Richardson had not followed proper procedure in taking the report; and that she should never call again. Ms. Carmichael also testified that Detective Henn told her that Ms. Moore could be anywhere with her boyfriend, and he did not know why Ms. Carmichael had called.

Ms. Carmichael returned to the 67th Precinct the next morning, on April, 26, 2003, with four family members. She complained to a Detective Hutchinson about how she was treated the night before, begged him for help, and asked him to call Mr. Williams's house to see if something was wrong when Ms. Moore visited him that evening. Detective Hutchinson stated that he could not call Mr. Williams's house and that there was nothing he could do because Ms. Moore was 21 years old.[2] Ms. Carmichael also testified that the detective told her to note the number of "missing person" posters hung up outside of the 67th Precinct: "[M]a'am you can check to see how many missing persons there are there. Do you think we can look for everyone." Pl.'s Ex. B, Carmichael Tr. 27.

On April 28, 2003, Ms. Carmichael sought the help of public officials, who contacted the 67th Precinct about Ms. Moore's disappearance. Ms. Carmichael testified that, around 2:00 p.m. that day, someone from the 67th Precinct called her, asking, "[W]hy are you calling all these officials to call this office looking for your daughter? Why are you bothering us?

Why are you just reporting us to everyone you feel like reporting us to look for your daughter?" *Id.*, Carmichael Tr. 34.

Under Section 207–23 of the NYPD Patrol Guide (the "Patrol Guide"), a "missing person" is defined as follows:

*MISSING PERSON*—Person missing from a NEW YORK CITY RESIDENCE and:

a. Under eighteen (18) years of age, OR

b. Mentally or physically impaired to the extent that hospitalization may be required, OR

c. Senile, retarded or disabled and not capable of self-care or clear communication, OR

d. Sixty-five (65) years of age or older, OR

e. Possible victim of drowning, OR

f. Indicated an intention of committing suicide, OR

g. Absent under circumstances indicating unaccountable or involuntary disappearance ("Category G").

Pl.'s Ex. A, Patrol Guide, NYC 806. "Persons eighteen (18) years of age or older, who have left home voluntarily because of domestic, financial or similar reasons" are excluded from the definition of a missing person. *Id.* The Patrol Guide expressly states that "[t]here are no minimum time limits that must be observed before accepting a report of a missing person." *Id.*, Patrol Guide, NYC 807. An "immediate investigation and/or search is required" for certain " 'special category' missing persons cases":

---

**2.** On oral argument, the City disputed the contents of the statements allegedly made to plaintiff by Detectives Henn and Hutchinson. However, in defendant's statement submitted pursuant to Rule 56.1 of the Local Civil Rules of this court, defendant submits these very statements "for purposes of this summary judgment motion only and no other purpose, including trial of this matter." Def.'s Rule 56.1 Statement, p. 1, ¶¶ 22–32.

a. Child under sixteen (16) years of age, OR

b. Mental/physically impaired to the extent that hospitalization may be required, OR

c. Senile, retarded or disabled and not capable of self-care or clear communication, OR

d. Sixty-five (65) years of age or older, OR

e. Unique/unusual case, OR

f. Missing under circumstances indicating unaccountable or involuntary disappearance, OR

g. Possible drowning victim.

*Id.*, Patrol Guide, NYC 808.

Under the Patrol Guide, a variety of actions are authorized when conducting an immediate investigation, including the two that plaintiff focuses on here—a door-to-door canvass of a missing person's travel route starting with where she was last seen and the use of NYPD-trained bloodhounds to assist in a search.

The parties do not dispute that, until April 28, 2003, the NYPD did not consider Ms. Moore to be a "Category G" "missing person" who was "[a]bsent under circumstances indicating unaccountable or involuntary disappearance." Pl.'s Ex. A, Patrol Guide, NYC 806.

After public officials called the precinct on April 28, 2003, Detective Wayne Carey was assigned to the case. That evening, Detective Carey visited and interviewed Ms. Carmichael, asked to see Ms. Moore's room, and took Ms. Moore's social security card and bank card from the house. He did not ask whether Ms. Carmichael wanted publicity for her daughter's absence. Ms. Moore gave the detective Mr. Williams's phone number.

Detective Carey visited Mr. Williams's home shortly after interviewing Ms. Carmichael. Mr. Williams stated that Ms. Moore dropped off CDs and was at his home for approximately ten or fifteen minutes. She told him she was going to Burger King, but would return home afterward and would call Mr. Williams. She never called. When Detective Carey visited Burger King, a cashier who knew Ms. Moore told him that she did not come in on April 24, 2003.

Over the next several days, Detective Carey also called other of Ms. Moore's friends, searched her bedroom, conducted searches using the NYPD database, canvassed hospitals and morgues, put out a description over the NYPD central radio and reported her as a "missing person," canvassed Ms. Moore's neighborhood, requested a bloodhound search, subpoenaed banks records, arranged for a search of Mr. Williams's house, and conducted various interviews.

The NYPD canvassed Ms. Moore's neighborhood on April 30, 2003. The search area included the house on Snyder Avenue in which it was later determined Ms. Moore had been held. The person who answered the door told the police that he or she had not seen Ms. Moore.[3] On April 30, 2003, Officer Jonathan Figueroa of the NYPD canine unit and his bloodhound, Kojak, ran three "trails" using Ms. Moore's shirt as a "scent article." The bloodhound-assisted search was unsuccessful.[4]

---

3. At oral argument, the parties expressed their understanding that one of the Wallace defendants answered the door at that house during the police's door-to-door canvass on April 30, 2003.

4. Officer Figueroa joined the canine unit in 1998 and had been working with Kojak since 2002. Officer Figueroa recalled successfully locating one missing person prior to conducting the search for Ms. Moore. For that

On April 29, 2003, Detective Carey interviewed a woman ("Victim 2") who had been kidnapped by two men the day before. Victim 2 had been held captive and raped in the basement of a house on Snyder Avenue, which is located approximately one block away from Mr. Williams's house, also on Snyder Avenue, and approximately three blocks away from Ms. Carmichael's house.

On May 10, 2003, the police found Ms. Moore's body lying along the side of a hotdog truck on Kings Highway, located about one block from both Snyder Avenue houses. On May 21, 2003, Detective Carey interviewed Kayson Pearson in connection with his investigation of the kidnapping and rape of Victim 2. Pearson admitted that he and Troy Hendrix had kidnapped, raped, tortured, and ultimately murdered Ms. Moore, at the Snyder Avenue house where she had been held. Both defendants were subsequently convicted and sentenced to life in prison.

The parties agree, for purposes of this motion, that Ms. Moore's death occurred at approximately 2:00 a.m. on April 27, 2003.

## II. Svetlana Aronov

Plaintiff compares the City's response to Ms. Moore's disappearance to its response to the disappearance of Svetlana Aronov.

On March 3, 2003, Ms. Aronov, an approximately forty-four year old white woman who lived on the Upper East Side of Manhattan, reportedly left home to walk her dog and never returned, leaving be-

search, he worked with a different bloodhound.

5. The court does not consider additional facts regarding Ms. Aronov's case that are proffered by plaintiff and are drawn from contemporaneous newspaper articles. Newspaper articles are generally inadmissible hearsay, *Mandal v. City of New York*, 2006 WL

hind her wallet, money, and identification. Her husband reported her missing around 11:20 p.m. on March 3, 2003.

The NYPD opened an investigation into Ms. Aronov's case that same night, and, by around 1:00 a.m. on March 4, 2003, Ms. Aronov's disappearance was designated as a "Category G" case. Around two-and-a half hours after Ms. Aronov was reported missing, an officer conducted a preliminary search for her. Within approximately four-and-a-half hours of Mr. Aronov calling the police, the NYPD had conducted an unsuccessful search with a bloodhound. And within twenty-four hours, the NYPD had conducted an area hospital and morgue search and conducted shoreline and rooftop searches by aviation. Additionally, the NYPD reviewed security tapes from the lobby in Ms. Aronov's building and other buildings nearby, held a press conference, handed out flyers, assigned two detectives to the case full-time to look into various potential leads, and hung up posters on the Upper East Side. It is undisputed that Ms. Aronov's body was found a few months later in the East River.[5]

## DISCUSSION

## I. Summary Judgment Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265

3405005, at *1 (S.D.N.Y. Nov. 26, 2006), and plaintiff offers no basis for their admissibility. Therefore, they cannot be used to defeat summary judgment. *See Fridman v. City of New York*, 183 F.Supp.2d 642, 646 n. 2 (S.D.N.Y. 2002) (citing Fed.R.Evid. 402 & Fed.R.Civ.P. 56), *aff'd* 52 Fed.Appx. 157 (2d Cir.2002).

(1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing a motion for summary judgment, a court is required to construe the facts in the light most favorable to the non-moving party, resolving all reasonable inferences and ambiguities against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). But the non-moving party cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). It instead must "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (emphasis in original) (internal quotation marks omitted).

## II. Liability Under 42 U.S.C. § 1983

■■ To establish a § 1983 claim, plaintiff must show that (1) a person acting under color of state law (2) deprived her of rights, privileges, or immunities secured by the Constitution and its laws.[6] 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Thus, though not itself a source of substantive rights, § 1983 affords "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."

*Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

### A. State Action

■■ Plaintiff's claim is that the discriminatory provision of services by the NYPD caused Ms. Moore injury. The City argues that state action is lacking by mischaracterizing plaintiff's claim as being that the City "compelled" Pearson and Hendrix, two criminal non-state actors, to kill Ms. Moore or somehow participated in or delegated aspects of the criminal activity. Def.'s Mem. in Supp. at 5. Ms. Carmichael also is not seeking, as the City argues, to make the City liable for the conduct of private actors who are regulated by the state. Rather, plaintiff's claim addresses injury allegedly caused by the City's discriminatory response to Ms. Moore's disappearance. Therefore, the cases relied upon by defendant addressing non-state actors' conduct that is regulated by the state, such as *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 258–60 (2d Cir.2008), *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 314 (2d Cir.2003), and *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 429 (2d Cir. 1977), are inapposite. Because there is no dispute that the actions or inactions at the heart of this case are attributable to state actors, *i.e.*, officers of the NYPD, the state action element is satisfied.

### B. Federal Right
#### 1. Nature of the Claim

Stating that no State shall " 'deny to any person within its jurisdiction the equal protection of the laws,' " the Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike."

---

**6.** "All conduct that satisfies the state-action requirement of the Fourteenth Amendment satisfies the § 1983 under-the-color-of-state-law requirement." *Stanescu v. Aetna Life & Cas. Ins. Co.*, 101 F.3d 1393, 1996 WL 466648 at *1 (2d Cir.1996).

*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting U.S. Const. amend. XIV § 1). Defendant distorts plaintiff's § 1983 claim, characterizing it as asserting a non-existent constitutional right to "adequate" police services. *See Town of Castle Rock v. Gonzales,* 545 U.S. 748, 768–69, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005); *Harrington v. Cnty. of Suffolk,* 607 F.3d 31, 34–35 (2d Cir.2010).

Plaintiff's claim is different. She alleges that Ms. Moore's right to equal protection was violated by the City's practice of "discriminat[ing] against Black missing persons with regard to missing person searches by failing to label missing Black persons 'missing,' and therefore fail[ing] to conduct immediate investigations for Black missing persons." Pl.'s Mem. in Opp. at 11–12. This claim is actionable because a state's selective denial of "its protective services to certain disfavored minorities" violates the Equal Protection Clause. *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.,* 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)); *see, e.g., Pyke v. Cuomo,* 258 F.3d 107, 109–110 (2d Cir.2001) (alleged refusal to provide police protection because plaintiffs were Native American); *Estate of Macias v. Ihde,* 219 F.3d 1018, 1028 (9th Cir.2000) (alleged refusal to provide police protection because of plaintiff's status as a woman and a victim of domestic violence); *Neighborhood Action Coal. v. City of Canton,* 882 F.2d 1012, 1017 (6th Cir.1989) (alleged failure of police to respond to calls from neighborhood because of racial composition). Indeed, the "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Hilton v. City of Wheeling,* 209 F.3d 1005, 1007 (7th Cir.2000).

██ Nor is plaintiff's claim automatically precluded because the NYPD ultimately opened an investigation into Ms. Moore's case. The claim is that she would have received more immediate services, and have been found in time to prevent her murder, had she not been African–American. "[D]iminished police services, like the seat at the back of the bus, don't satisfy the government's obligation to provide services on a non-discriminatory basis." [7] *Elliot–Park v. Manglona,* 592 F.3d 1003, 1007 (9th Cir.2010).

## 2. Municipal Liability

Plaintiff has not sued any NYPD officers individually, but has instead filed this action solely against the City, alleging the existence of a "widespread, racially discriminatory practice of failing to conduct immediate searches for Black missing persons in the same manner as non-Black

---

**7.** The City argues that "a denial of police services usually refers to police *protection,* which is fundamentally different from the claim plaintiff pursues here." Def.'s Reply at 5 (emphasis in original). This is a distinction without a difference. First, if the police dispensed any services—be it their protection of the public, their investigation of crimes, or something else—in a discriminatory manner, such conduct could implicate the Equal Protection Clause. *See Elliot–Park,* 592 F.3d at 1007 ("While the Supreme Court may have written in *DeShaney* that the government

couldn't 'selectively deny its protective services' to disfavored minorities, that certainly doesn't imply that the government can selectively deny its non-protective services to disfavored minorities.") (internal citations omitted). Second, at least in this context, it is unclear how a court might draw a line between "police protection" and other "police services"; plaintiff's theory is that, if the NYPD had provided the "service" of an immediate investigation, Ms. Moore might have been "protected" from further harm.

missing persons." Pl.'s Mem. in Opp. at 12.

■ "Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 438 (2d Cir.2009); *Eagleston v. Guido*, 41 F.3d 865, 878 (2d Cir.1994). In "police failure-to-serve cases, the courts consistently have required more evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving minority victims." *Moua v. City of Chico*, 324 F.Supp.2d 1132, 1140 (E.D.Cal.2004) (police's slow response to repeated attacks against Hmong plaintiffs did "not of itself show discriminatory intent"); *Okin*, 577 F.3d at 438–39 (rejecting argument that "repeated deviations from the mandatory arrest statute and from corresponding police department policy" with respect to one female domestic violence victim, could be grounds for an inference of gender bias). Rather, courts have required "a showing of a pattern of failure to provide an adequate police response to minority complainants or direct evidence of racial disparagement among police officers" to establish discriminatory intent.[8] *Moua*, 324 F.Supp.2d at 1140 (equal protection claim failed because plaintiffs presented no "direct or indirect evidence of

racial animus" such as "racist or biased comments"); *Okin*, 577 F.3d at 439 ("She might be able to [show that her gender motivated the police's treatment] if she had compared evidence of the mariner in which defendant police departments responded to comparable non-domestic violence incidents, with the manner in which they responded to domestic violence at her house, but again she does not attempt such a comparison."). In *Mody v. City of Hoboken*, 959 F.2d 461 (3d Cir.1992), for instance, the Third Circuit held that plaintiff presented no evidence that police actions taken with respect to Asian Indian victims were racially motivated, explaining:

> It would be different if Mody had shown the police uttered racial slurs against Asian Indians or produced other evidence of an atmosphere of disparagement towards Asian Indians among the police that was knowingly tolerated by the Hoboken officials responsible for police conduct, or presented evidence of a consistent police pattern of conduct that required Asian Indian assault victims, but not victims from other discrete minorities, to file criminal complaints before suspects would be apprehended.

*Id.* at 467.

■ Before a municipality can be held liable under § 1983, it must be shown to have been "the moving force of the consti-

---

**8.** Of course, as the City argues, if a *Monell* claim is based on the actions of an individual defendant who is found not liable, a municipality employing the individual defendant cannot be found liable. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Here, however, rather than basing her claim on any individual officer's discriminatory actions, plaintiff's claim involves the City's policy as a whole. Nor is the City correct in arguing that, to make out a claim against the City, plaintiff must show that individual officers acted with discriminatory intent. As discussed above, discriminatory intent is a necessary element

of an equal protection claim; however, pointing to animus on the part of individual officers is not the only way to make such a showing. For example, if there were an official municipal policy mandating discriminatory treatment of missing persons and individual officers followed the policy without themselves displaying subjective discriminatory intent, the policy itself would still violate the Equal Protection Clause. Further, a department's pattern of failing to provide an adequate police response to a protected class could indicate discriminatory intent. *See Moua*, 324 F.Supp.2d at 1140.

tutional violation." *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690–91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Cash v. Cnty. of Erie*, 654 F.3d 324, 341–42 (2d Cir.2011) (equating "moving force" and "proximate cause"). In other words, municipalities may be held liable under § 1983 "when, and only when, their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

▮ "Official policies" can take many forms. A plaintiff "need not identify an express rule or regulation." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir.2004). "It is sufficient to show, for example, that a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law,' or that a discriminatory practice of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policymaking officials.'" *Id.* (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir.1992)) (internal citations omitted).

For example, in *Sorlucco*, 971 F.2d at 873, the Second Circuit reversed the district court's entry of judgment n.o.v. for the defendant, finding that evidence presented at trial allowed the jury to conclude that the NYPD had engaged in a persistent, widespread practice of disciplining probation officers differently based on their gender. The plaintiff had presented a variety of evidence of such a practice, including statistical evidence that 100% of disciplined female probation officers were terminated compared with 63% of male probation officers whom the jury could have found were similarly situated; "ample facts" concerning the NYPD's unusually insensitive treatment of the plaintiff;

and expert testimony that the NYPD's investigation of the plaintiff's case differed from its usual practices. *Id.* at 872–73. The jury also was able to infer that bias existed across the department based on the discriminatory actions of two independently functioning NYPD offices. *See id.* at 873.

▮ In contrast, "isolated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir.2012) (evidence of two or three instances over several years "fell far short of showing a policy, custom, or usage of officers to abuse the rights of black people"); *Giaccio v. City of New York*, 308 Fed. Appx. 470, 472 (2d Cir.2009) (evidence of "only four examples" was insufficient to establish a municipal practice); *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir.2006) ("A reasonable jury could not find that evidence of one instance in which emergency personnel were not familiar with the correct protocol constituted a [municipal] practice"); *Patterson*, 375 F.3d at 227 (two correctional officers who made racially offensive comments and third-party evidence that was conclusory or inadmissible hearsay did not establish a municipal practice).

### 3. Plaintiff's Evidence of Municipal Liability

Plaintiff's *Monell* claim fails because she does not produce evidence sufficient to show that the NYPD had a widespread and persistent but unspoken practice of failing to conduct immediate searches for African–American persons reported as missing, in contrast to its treatment of white persons reported as missing, or that Ms. Moore's race motivated the treatment

she received.[9] Ms. Carmichael does not contend that individual officers demonstrated overt racial animus, but instead argues that discriminatory intent can be inferred from a discernable, widespread pattern in the NYPD's conduct toward African–American missing persons.

Plaintiff relies on a statistical analysis of missing persons conducted by an economist, Mark Killingsworth, analyzing the representation of African–Americans among missing persons relative to the representation of African–Americans in the general population.[10] Dr. Killingsworth finds a "shortfall" between the "expected" and the "actual" representation of African–American missing persons in New York City, compared with the representation of African–Americans among missing persons in the United States, which he uses as a "benchmark."[11] Def.'s Ex. H, Rebuttal Report ¶¶ 5–13, 19–20. He concludes that "there are sizeable shortfalls of blacks among missing persons ... in New York City as a whole, relative to the numbers one would expect.... Moreover, all of these shortfalls are statistically significant." *Id.* ¶ 19. He opines, for example, that, based on national benchmarks for persons at least 21 years of age, African–Americans would be expected to comprise 45.1% of the missing persons population in New York City, but actually comprise only 42.7%. *Id.*, Table 3. According to Dr. Killingsworth, this 2.4% "shortfall" represents a roughly 162 person discrepancy and constitutes 3.9309 "standard errors."[12] *Id.* ¶ 12, Table 3. Although Dr. Killingsworth does not connect the "shortfalls" with discrimination, plaintiff submits the study as being "indicative of discrimination" and "highly probative of the existence of a widespread policy or custom." Pl.'s Mem. in Opp. at 15, 17.

---

9. Ms. Carmichael's claim is based on the NYPD's alleged discriminatory practice of failing to conduct immediate investigations for African–Americans who are reported missing. She does not claim that the NYPD's stated policy, as manifested in the Patrol Guide or other documents, prescribed differential treatment of missing persons based on race.

10. Plaintiff relies upon the statistical analysis in Dr. Killingsworth's rebuttal report, which utilizes the general methodology of the City's expert, Abraham Wyner, rather than the methodology used by Dr. Killingsworth in his original report, which is submitted to the court by the City. His original report assumes that the expected percentage of African–Americans in the missing persons population in a given location should be twice the percentage of African–Americans in the general population because that ratio is present in the nationwide data. Dr. Wyner argues, and Dr. Killingsworth does not rebut, that, if Dr. Killingsworth's assumption were true, a city whose general population is more than 50% African–American would be expected to have African–Americans comprising *more than 100%* of the missing persons population, which is mathematically impossible. Dr. Wyner's equation—adopted by Dr. Killingsworth in his rebuttal report—does not produce expected missing persons percentages exceeding 100%.

11. As discussed below, Dr. Killingsworth's rebuttal presents an additional borough-level analysis that sets forth Manhattan and Staten Island as benchmarks. At oral argument, plaintiff emphasized the importance of using United States as a benchmark rather than Manhattan and Staten Island.

12. "Standard deviation analysis measures the probability that a result is a random deviation from the predicted result—the more standard deviations the lower the probability the result is a random one." *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1376 (2d Cir.1991). The Second Circuit has held that two or three standard deviations could be regarded as "statistically significant." *See, e.g., Malave v. Potter*, 320 F.3d 321, 327 (2d Cir.2003); *Ottaviani v. State Univ. of New York*, 875 F.2d 365, 372–73 (2d Cir.1989); *Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm.*, 630 F.2d 79, 86–87 (2d Cir.1980).

In addition to Dr. Killingsworth's analysis, Ms. Carmichael relies on the difference between how Ms. Moore's case was treated and how Ms. Aronov's case was treated.

While the City does not dispute Dr. Killingsworth's qualifications, it challenges the admissibility of Dr. Killingsworth's testimony pursuant to Rule 702 of the Federal Rules of Evidence based on relevance and reliability—whether it is "based on sufficient facts or data," or "the product of reliable principles and methods." [13]

■■■ The district court's "gatekeeping" function under Rule 702 ensures "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To evaluate relevance, a court must decide whether the information provided "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Civ.P. 702. Expert testimony that is not probative of a fact in issue is irrelevant and inadmissible. *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir.2002); *see also* Fed.R.Evid. 403 (providing for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence").

■■■ With respect to reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case," as well as any other factors bearing on reliability. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.2007). To justify the "wide latitude" afforded expert witnesses "to offer opinions, including those that are not based on firsthand knowledge or observation," *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786, Rule 702 asks the court to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■■■ The district court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S.Ct. 1167 (emphasis omitted). Thus, although there is a presumption of admissibility of expert evidence, *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995), where such evidence "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," a court has the discretion to exclude the testimony, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks omitted); *Amorgianos v. Nat'l R.R. Passenger*

---

**13.** Under Rule 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Corp.,* 303 F.3d 256, 266 (2d Cir.2002) ("when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony"); *Lightfoot v. Union Carbide Corp.,* 175 F.3d 1008, 1999 WL 110424 at *2 (2d Cir. Mar. 1, 1999) ("Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value.").

■ Dr. Killingsworth's statistical analysis is fraught with issues undermining its relevance and reliability. He is commendably candid regarding the unreliability of the data upon which he bases his analysis. He explains that "data on missing adults are not generally available, and, when available, such data are typically not available in a form that is suitable for detailed analysis." Def.'s Ex. H, Original Report ¶ 2. This problem affects Dr. Killingsworth's national benchmark analysis. He relies on the Federal Bureau of Investigation's National Crime Information Center's tabulation of missing adults by race, which "does not provide the data underlying this tabulation in the form of a database that can be analyzed" such as by "individual metropolitan areas or states" or by "specific age groups (18–29, 30–39, 55–65, etc.) within the adult population." *Id.* Dr. Killingsworth does not address whether the FBI compiles the data jurisdiction by jurisdiction, or whether the FBI compilation or the underlying compilations for various jurisdictions were made in a manner similar to the compilation of the NYPD's database of missing persons.[14] In

particular, Dr. Killingsworth does not indicate how the FBI database or the various jurisdictions from which it draws its data define "missing persons," and whether the definition or definitions are comparable to the NYPD's "missing persons" criteria. He further acknowledges that the "definition of 'missing' raises difficult and complex conceptual issues, and reported data on missing persons may not always be reliable," citing a British study indicating that a lower proportion of ethnic minorities may be reported missing to the police. *Id.* ¶ 4.

Even were the national statistics sufficiently reliable—meaning that the data was sound and comparable to the City's— Dr. Killingsworth offer no reason why the demographic composition of missing persons in the United States as a whole is an appropriate benchmark for the demographic composition of missing persons in New York City. For example, he does not address any disparities among the various jurisdictions making up the United States. He simply assumes the reasonableness of the benchmark and that any disparities between the benchmark and the New York City figures constitute a mathematical "shortfall." *Cf. Johnson v. Northwest Airlines,* 53 F.3d 331, 1995 WL 242001, at *3 (6th Cir. Apr. 24, 1995) (affirming summary judgment in favor of defendant where "plaintiff gives ... no reason why his baseline ... provides the appropriate statistic" for assessing discriminatory impact); *accord Valdez v. City of San Jose,* 2013 WL 752498, at *13 (N.D.Cal. Feb. 27, 2013).

And, even assuming the statistical disparity between the United States data and the New York City data could be relied upon as accurate, plaintiff's expert offers

---

**14.** The database compiles entries on persons the NYPD categorized as missing from January 2000 through May 2003, and denotes the persons' gender, age, race, and Patrol Guide category.

no opinion, based on his statistical analysis, that the disparity is the result of racial discrimination. Instead, he merely concludes that the "shortfalls" are "statistically significant," meaning the disparity is "unlikely to have resulted from chance." Def.'s Ex. H, Rebuttal Report ¶¶ 10 & n. 4, 12, 19.

Dr. Killingsworth's conclusion is necessarily modest because he does not conduct a multiple regression analysis, and the disparity he finds is therefore potentially explained by non-discriminatory factors. "Multiple regression analysis is a statistical tool commonly used by social scientists to determine the influence that various independent, predetermined factors (so-called independent variables') have on an observed phenomenon (the so-called 'dependent variable')." *Ottaviani v. State Univ. of New York*, 875 F.2d 365, 366–67 (2d Cir.1989). By isolating the factors, statisticians can better understand which factor is most responsible for a particular result. *See id.* at 367. Although multiple regression analysis "is not a prerequisite for the admission of statistical reports" in discrimination cases, *Equal Emp't Opportunity Comm'n v. Venator Grp.*, 2002 WL 181711, at *2 (S.D.N.Y. Feb. 5, 2002), "[t]he Second Circuit has repeatedly held that statistical evidence purporting to show the effects of discrimination is not probative of an employer's intent where no effort is made to account for other possible causes of the disparity," *Fahmy v. Duane Reade, Inc.*, 2006 WL 1582084, at *7 (S.D.N.Y. June 9, 2006). For example, in *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir.1999), the Second Circuit held that the district court did not abuse its discretion in declining to give a statistical analysis any probative weight where the plaintiff's expert did not attempt to control for potential non-discriminatory causes of a disparity in course evaluation scores, and

instead assumed that race bias produced the disparity.

Plaintiff's argument assumes that, since the disparity found by Dr. Killingsworth cannot be attributed to chance, it must be attributed to racial discrimination. However, since Dr. Killingsworth did not control for other possible causes for the disparity, plaintiff's conclusion is speculative.

It also bears noting that Dr. Killingsworth's analysis does not address the crux of plaintiffs claim, which is the *delay* by the NYPD in listing African–American persons as missing. It is the delay in listing her as missing and initiating an investigation that plaintiff claims violated her rights, and there is no statistical evidence as to delays in listing or investigating by race.

Dr. Killingsworth's rebuttal report presents additional, borough-level statistics comparing the representation of African–Americans among missing persons in Brooklyn, the Bronx, and Queens—"the three boroughs with the greatest representation of blacks and which account for almost three-fourths of the City's missing persons"—with Manhattan and Staten Island, rather than the United States as a whole. Def.'s Ex. H, Rebuttal Report ¶ 20. By presenting Manhattan and Staten Island as benchmarks, he implies that boroughs with smaller African–American populations properly categorize African–Americans as missing and that Brooklyn, Queens, and the Bronx "fail" to meet the benchmarks. Even accepting this implication, the comparison among boroughs would not enable a fact-finder to determine that defendant engaged in a *citywide* practice of dilatory, discriminatory investigations for African–American missing persons. Most importantly, Dr. Killingsworth offers no opinion that the differences among boroughs are caused by

racial discrimination, and such a conclusion would be speculative.

In sum, Dr. Killingsworth's analysis is built on data, methodology, and assumptions that render his conclusions of limited relevance and reliability. Moreover, he never opines on the fundamental issues that the jury would be asked to decide, and the inferences of discrimination that plaintiff would ask the jury to draw from his conclusions would be pure speculation.

▇ The only other evidence upon which plaintiff relies is evidence comparing Ms. Moore's and Ms. Aronov's cases. Although a jury could well find that there was differing treatment of the two cases, and even assuming that this differential treatment could be taken as racially motivated, it is well established that a single case, even so tragic a case as Ms. Moore's, cannot itself show a practice so persistent and widespread as to constitute a custom or usage with the force of law. *See supra* Part II.B.2. Despite the opportunity for full discovery, plaintiff has produced no evidence of another instance of alleged discrimination, let alone the existence of a widespread, persistent practice.

Therefore, the relevant, reliable evidence would not permit a rational factfinder to conclude that the City engaged in a discriminatory practice so widespread as to permit an inference that it intentionally discriminated against African–Americans reported as missing.

## 4. The Law of Damages Under § 1983 and Plaintiff's Evidence [15]

▇ A plaintiff claiming a violation of § 1983 "is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury." *Amato v. City of Saratoga Springs,* 170 F.3d 311, 317 (2d Cir.1999); *Carey v. Piphus,* 435 U.S. 247, 253–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). "By making the deprivation of such ['absolute'] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed...." *Carey,* 435 U.S. at 266, 98 S.Ct. 1042.

▇ Where a plaintiff demonstrates that the violation of a federally protected right was the proximate cause of her actual injury, she is eligible for compensatory damages, the usual measure of damages in a § 1983 action. *See id.* at 254–55, 98 S.Ct. 1042; *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) ("To recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by a constitutional violation."). Where the causal connection is "too tenuous," the constitutional deprivation is not the proximate cause of actual injury. *Phillips v. City of New York,* 871 F.Supp.2d 200, 206 (E.D.N.Y.2012); *see also Warner v. Orange Cnty. Dep't of Prob.,* 115 F.3d 1068, 1071 (2d Cir.1996) ("in cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability"). "While questions relating to proximate cause are normally questions of fact, a court may decide that a reasonable jury can reach only one conclusion, and decide the issue as a matter of law." *Adamczyk v. City of Buffalo,* 1998 WL 89342, at \*5 n. 11 (W.D.N.Y. Feb. 23, 1998) (internal quotation marks omitted); *see also Packer v.*

---

**15.** Since it has been determined that no reasonable jury could find that there is a discriminatory practice so persistent and widespread as to justify the imposition of municipal liability, plaintiff's § 1983 claim must be dismissed. However, additionally, I will address the damages issue briefed by the parties.

*Skid Roe, Inc.,* 938 F.Supp. 193, 196 (S.D.N.Y.1996).

 Plaintiff asserts that she can show she suffered actual damages as a result of the City's actions. She argues that, if Ms. Moore had been labeled as "missing" immediately, a bloodhound-assisted search conducted within hours of her being reported missing and a door-to-door canvass of her last known route would have located Ms. Moore while she was alive.[16]

In support of plaintiff's contention that there are "issues of fact as to whether a bloodhound search conducted in connection with an immediate investigation would have led the NYPD to where Ms. Moore was being held while she was still alive," plaintiff proffers a report by a bloodhound expert, Lisa Harvey. Pl.'s Mem. in Opp. at 23. Dr. Harvey, who has a master's degree in forensic science and a master's and doctorate in physiology, has personally trained numerous bloodhounds, assisted law enforcement with bloodhounds, run trails for missing persons hundreds of times, and published peer-reviewed scholarly articles on bloodhounds. Her knowledge of, and experience with, bloodhounds qualify her as an expert in this case.

After studying the facts, Dr. Harvey concluded that, if Kojak's training resembled that of other bloodhounds she knew and met the standards she would have expected of an NYPD-trained bloodhound, it was highly probable that Kojak would have been able to immediately pick up Ms. Moore's scent and could have found Ms. Moore, if the search had begun within six hours of Ms. Moore being reported missing.[17]

To the extent that her report is ambiguous about how much time it would have taken for Kojak to actually locate Ms. Moore in such a scenario, any uncertainty was resolved during her deposition. Dr. Harvey unequivocally stated that she had "no idea," "wouldn't know," and she knew of no way to determine the length of time. Def.'s Ex. J, Harvey Tr. 84–85; Pl.'s Ex. WW, Harvey Tr. 98. While Dr. Harvey explained that bloodhounds can "trail" in highly-trafficked urban areas and that she has never known a bloodhound which "lost" a scent, she also testified that a missing person's scent might lead in numerous directions because, "if [she] live[s] in that area, [she] will have walked in different directions," taking her scent with

16. Defendant argues that the NYPD was not aware that Ms. Moore had gone to see Mr. Williams—whose home was the starting point of Ms. Moore's last known route—until Detective Carey interviewed him on April 28, 2003, "by which time Ms. Moore was already dead." Def.'s Reply at 13. However, defendant does not dispute that, on the morning of April 25, 2003, Ms. Carmichael informed Officer Richardson that she had called her daughter's friend, "Gary," who told her that that Ms. Moore had been at his house the evening before. Def.'s Rule 56.1 Statement ¶ 15. Even if Ms. Carmichael did not tell Officer Richardson Mr. Williams's last name, Officer Richardson could have easily discovered it, as well as his telephone number and address. A reasonable jury could conclude that, by April 25, 2003, the City was on notice that Ms. Moore went to "Gary's" house after leaving her home on April 24, 2003, and that his house may have been her last known location.

17. To the extent that Dr. Harvey's report attacks the way in which the NYPD conducted its search, it is irrelevant to plaintiff's claim, which is not that the NYPD exercised incompetence only with respect to searches of African–American missing persons. For example, Dr. Harvey opines that the scent article that Officer Figueroa used was contaminated because several people touched the clothes in Ms. Moore's hamper after she wore the article; accordingly, Dr. Harvey states that Officer Figueroa and Kojak should have, but seemingly did not, conduct the "missing-member method," which allows a dog to isolate and trail the scent of only the missing person.

her each direction. Pl.'s Ex. WW, Harvey Tr. 48, 80; Def.'s Ex. J, Harvey Tr. 83–84. Scents going in multiple directions "may take you into different trails, so therefore [may] take you a longer time to locate the [missing] person" because the bloodhound could follow any of the trails. Def.'s Ex. J, Harvey Tr. 84.

At most, plaintiff's expert can establish that, had the police conducted a bloodhound search sooner, it is likely that the bloodhound would have *eventually* found Ms. Moore. Dr. Harvey's opinion therefore does not tend to make it more probable that an immediate investigation would have led the NYPD to Ms. Moore *within the window of time that she was alive* so as to show that the City's alleged discriminatory delay in providing police services was a proximate cause of Ms. Moore's death.

Nor does plaintiff proffer other evidence sufficient to bridge this gap. Plaintiff presents evidence tending to show that the police were likely to have conducted a door-to-door canvass and, separately, a bloodhound-assisted search if the police had immediately labeled Ms. Moore as missing. In fact, plaintiff argues that these actions would have been required.[18] But even treating these actions as mandatory under the Patrol Guide, the possibility of finding Ms. Moore before she was killed remains entirely speculative. A jury could reasonably conclude that an immediate canvass of the neighborhood would probably have included the house where Ms. Moore was held because the police's actual door-to-door search included that address. Yet, when the police in fact visited the house where Ms. Moore had been held

captive, their visit did not elicit a helpful response; and plaintiff presents no evidence that an earlier search was likely to have produced a different outcome. In sum, plaintiff has produced no evidence tending to show that more immediate police efforts would have found Ms. Moore in time to save her life. Therefore, no reasonable jury could find that the NYPD's delay in providing police services was the proximate cause of Ms. Moore's actual injuries.

Accordingly, even if plaintiff could establish a *Monell* violation, which she cannot, plaintiff would, at most, be entitled to nominal rather than compensatory damages.

## III. 42 U.S.C. § 1981

 Section 1981(a) of Title 42 of the United States Code states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and *to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens,* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (emphasis added). To state a claim under § 1981, a plaintiff must allege: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). Like § 1983, § 1981 "also pro-

---

**18.** Plaintiff relies on a police student's guide and the Patrol Guide indicating that these measures would have been appropriate, the testimony of an officer who conducted the April 30, 2003 door-to-door search for Ms.

Moore, and evidence showing that the NYPD conducted a door-to-door canvass and bloodhound search for Ms. Aronov within hours of her being reported missing.

hibits only intentional racial discrimination." *Brisbane v. Milano,* 443 Fed.Appx. 593, 594 (2d Cir.2011). For the reasons explained above, a reasonable juror could not find that the City purposefully discriminated against Ms. Moore on the basis of her race. Accordingly, the court grants defendant's motion for summary judgment as to plaintiff's claim brought pursuant to § 1981.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment dismissing all claims against the City is GRANTED.

**SO ORDERED.**